1

2

3

4

5

6

7                               UNITED STATES DISTRICT COURT

8                               EASTERN DISTRICT OF CALIFORNIA

9

10    UNITED STATES OF AMERICA and          No.  2:15-cv-00619-MCE-CKD
      THE STATE OF CALIFORNIA ex rel.
11    TAMARA EVANS,

12                    Plaintiff/Relator,     **MEMORANDUM AND ORDER**

13        v.

14    SOUTHERN CALIFORNIA
      INTERGOVERNMENTAL TRAINING
15    AND DEVELOPMENT CENTER, and
      DOES 1-10,
16
                      Defendants.
17

18

19        On March 19, 2015, Relator Tamara Evans ("Relator") initiated this qui tam action

20    on behalf of the United States and the State of California, alleging that Defendant

21    Southern California Intergovernmental Training and Development Center ("Defendant" or

22    "RTC"),[1] violated the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA") by

23    submitting false invoices for training classes RTC provided to California peace officers in

24    accordance with the federal Violence Against Women Act of 1994, 108 Stat. 1941-42

25    ("VAWA").  Relator also claims that RTC did not provide supporting documentation for its

26    invoices and further made false statements and/or certification in order to get the

27        [1] Defendant was formerly known as the San Diego Regional Training Center and did business
      under that title, and still uses the moniker "RTC" based on that earlier designation.  See Decl. of Michael
28    Gray, ECF No. 85-5, ¶ 3.

1  invoices paid, also in violation of the FCA, because federal funding was used to pay for

2  the VAWA classes.

3  By Notices filed December 7 and 8, 2016, respectively (ECF Nos. 21, 22) both the

4  State of California and the United States elected not to intervene in this matter, leaving

5  Relator free to pursue the matter alone.

6  Now before the Court are motions filed by both sides for judgment as a matter of

7  law under Federal Rule of Civil Procedure 56.  First, Relator has filed a motion for

8  summary adjudication as to liability only (ECF No. 81), arguing that there is no triable

9  issue that RTC made false representations in order to collect federal funds.   RTC, in

10  addition to opposing Relator's Motion, has also filed its own motion for summary

11  judgment, or alternatively for summary adjudication of issues (ECF No. 85), on grounds

12  that it is clear, from both the undisputed facts and applicable law, that no violation of the

13  FCA has occurred.

14  As set forth below, Defendant's Motion for Summary Judgment is GRANTED, and

15  Relator's Motion is accordingly DENIED.[2]

16

17  **BACKGROUND**

18

19  Defendant RTC is a joint powers agency that provides training and consulting

20  services to public agencies throughout the State of California, including peace officer

21  training classes.  Compl, ECF No. 1, ¶ 16.  As a joint powers agency, RTC is a state

22  governmental entity.  Def.'s Stmt. of Undisputed Fact, ECF No. 85-2 ("UMF"), No. 5.

23  Beginning in approximately 1997, RTC entered into annual contracts, first with the

24  Commission on Peace Officer Standards and Training ("POST"), and then with the

25  California Emergency Management Agency ("CEMA") (now known as the California

26  Office of Emergency Services ("COES") to furnish VAWA training to California peace

27

28

---

[2] Although Relator's counsel requested oral argument as to both motions (ECF No. 99), Local Rule 230(g) permits the Court to submit matters on the briefing if it decides that oral argument would not be of material assistance, and the Court made that determination here.

officers.  Federal funding for the classes was provided through grants provided by the

United States Department of Justice Office of Violence Against Women ("OVW")  to the

State of California.  The State of California, in administering the federal VAWA grants it

received, awarded annual subgrants of those funds to POST, also beginning in 1997

and continuing until the close of fiscal year 2013-14, which ended on June 30, 2014.  Id.

at No. 3.  Thereafter, CEMA/COES have received the subgrants.  Id. at No. 7.  Both

POST and CEMA/COES were and are agencies of the State of California.  Id. at Nos. 4-

5.

　　　　Between 1997 and 2000, Jan Bullard worked as a Management Fellow and Law

Enforcement Consultant ("LEC") for POST and had responsibility for administering the

State's VAWA subgrants to POST along with the annual contracts POST entered into

with RTC to provide VAWA training.  According to Ms. Bullard's deposition testimony, at

the time she assumed those duties POST had already established invoicing

procedures/practices for its VAWA contracts with RTC.  Those policies, which

Ms. Bullard claimed were followed throughout her tenure with POST, included an

agreement between POST and RTC that RTC need only provide "budgeted" costs for

each VAWA training class, with POST paying invoices based on those "budgeted"

amounts.  Id. at No. 10.  According to Ms. Bullard's deposition testimony, the initial

projected cost for each kind of VAWA class provided was based on actual costs to put

on the classes, and because those costs were relatively static, POST and RTC agreed

to use the same figures to budget future classes.  Bullard Dep., pp. 19-25.  As such,

Ms. Bullard testified that the budget numbers were not "pulled out of the air."  Id.

at 24:11-25.

　　　　Bullard believed that POST decided to forego that requirement in order to

account for certain variables in actual costs (for renting meeting rooms and with respect

to the number of students who actually attended the classes, for example) that could not

be avoided.  Therefore, although the RTC contracts themselves contained a provision

that invoices had to be based on RTC's "actual" costs, POST fully paid RTC's VAWA

1    invoices for the agreed upon budgeted amounts as if they tracked "actual" costs, even

2    though both POST and Ms. Bullard knew the budgeted costs were not necessarily RTC's

3    "actual" costs for each VAWA training class given certain variables that could not be

4    avoided for which an average number was used.   UMF Nos.11-12.   Ms. Bullard

5    believed this approach was consistent with POST's internal regulations.[3]  Ms. Bullard

6    believed that variance had been authorized by state counsel. Id. at No. 11

7         In 2004, Ms. Bullard trained Relator, as a Management Fellow, on how to

8    administer the VAWA program.  In so doing, she showed Relator applicable records and

9    documents, including POST's VAWA contracts with RTC and RTC's budget-based

10   invoices.  Ms. Bullard states that she provided similar training to other incoming LECs in

11   the early 2000's. Id. at No. 12.

12        POST's established practice of accepting invoices for budget-based as opposed

13   to actual costs did not change after Michele Thompson became Executive Director of

14   RTC in 2005.  Until January 1, 2010, POST continued to fully pay RTC's invoices

15   prepared in this manner even though the annual VAWA contracts themselves between

16   POST and RTC provided for payment based on actual costs. Id. at No. 14.

17        In June of 2009, Edmund Pecinovsky became POST's Bureau Chief in charge of

18   VAWA training (as well as other training provided under the auspices of similar

19   programs) and remained in that position until he retired at the end of 2011. Id. at No. 15.

20   Between July 2009 and December 31, 2009, he authorized RTC to submit budget-based

21   VAWA invoices without supporting documentation. Id.   During that period, in November

22   2009, Relator was assigned to work under Pecinovsky as an LEC responsible for

23   overseeing POST's VAWA classes, a position she held until being reassigned on or

24   about June 30, 2010. Id. at No. 16.  Relator thereafter had no further responsibility for or

25        [3] POST's so-called Regulation 1054 specifies how course budgets are developed, and just what
26   can be charged by contractors.  Bullard Dep., 55:12-17.  Prior to the CEMA audit in March 2010, Edmond
     Peconvsky believed that VAWA training classes could be budgeted using Regulation 1054 to capture
27   indirect costs in an amount up to 20 percent of certain contracted amounts.  Pecinovsky Dep., 84: 3-13;
     123:8-21.  According to Pecinovsky, POST utilized this approach for all its contractors prior to 2010, not
     just RTC.  Id. at 124:4-20.  At the time of that audit he was told that this did not in fact comport with federal
28   requirements.  Id. at 84:3-13.

1   contact with POST's VAWA program or RTC's VAWA contracts and invoices.  Id. at

2   No. 18.

3          In the Fall of 2009, another LEC working for Edmond Pecinovsky, Anne Brewer,

4   told him that contractors in other POST-administered training programs were submitting

5   budget-based invoices and being paid for budgeted as opposed to actual costs.  Upon

6   realizing that this practice did not comply with the terms of POST's actual contracts,

7   Pecinovsky determined that beginning on January 1, 2010, all contracts, including those

8   with RTC, would need to be invoiced using actual costs.  At the same time, however, he

9   agreed that through the end of 2009, POST would continue to fully pay submitted

10  budget-based invoices, so long as those invoices did not exceed the amounts specified

11  in the contracts' Budget Breakdowns.  Id. at No. 19.  Pecinovsky advised the LECs

12  working under his direction, including Relator, that he had decided to end the previous

13  practice of budget-based billing and transition to actual costs invoicing.  Id. at No. 20.

14  Consequently, until December 31, 2009, RTC continued to submit invoices in that

15  manner with POST's approval.

16         With respect to RTC's VAWA invoices in particular, Pecinovsky testified at

17  deposition that he did not learn from Relator[4] that RTC was submitting budget-based

18  billings.  Instead, it "was something [he and POST] already knew . . . , [and] was, at least

19  for [him], common knowledge" and "common practice," since the same billing procedures

20  had "been in place for many years."  Id. at No. 21.  Pecinovsky did not believe that

21  anyone at RTC ever represented that its invoices prior to 2010 were ever for actual

22  costs; nor did RTC ever conceal that its billings were budget-based.  Pecinovsky Dep.,

23  41:18-43:15.  Even Relator testified that Michele Thompson, RTC's Executive Director,

24  told her in no uncertain terms that RTC's billings for that period was budget-based as

25  opposed to being premised upon actual costs.  Thompson Dep., 141:24-142:2.

26  ///

27         [4] Relator also confirmed in her deposition that Pecinovsky had not learned from her that RTC was
    submitting budget-based VAWA invoices, and further admitted that other POST contractors were also
28  submitting invoices in the same manner.  Id. at No. 22.

1        On February 4, 2010, Don MacMillan, who identified himself as CEMA's

2    Associate Management Auditor, sent an email to Relator in her capacity as an LEC at

3    POST responsible for overseeing and managing grant-funded contracts, including

4    POST's expenditures of subgrant funds obtained from CEMA.  Id. at Nos. 30, 23.  That

5    mail advised Relator that MacMillan wished to make a "grant monitoring visit" and asked

6    to review all supporting documentation for POST's reimbursement requests for monies

7    charged against the VAWA subgrant from CEMA between July 1, 2009, and

8    December 31, 2009, including the VAWA invoices submitted by RTC.  Id. at No. 30.

9        On March 16, 2010, the first day of the two-day CEMA audit, Relator told

10   Mr. MacMillan that POST had no supporting documentation for the VAWA invoices

11   because it used budget-based billings, with RTC to retain any documentation and

12   provide it upon request.  Id. at Nos. 24-25.[5]  At the conclusion of his audit the next day,

13   Mr. MacMillan reported his findings to both Mr. Pecinovsky and Relator in an

14   "outbriefing," for which both Relator and Pecinovsky took notes.  Pecinovsky's typed

15   notes indicated that "POST needs to stop paying RTC budget costs and begin paying

16   actual costs for classes" and needed to obtain "supporting documentation."  Id. at

17   No. 38.  Similarly, Relator's handwritten notes indicated that POST "cannot pay

18   contractor the budgeted amount instead of actual amount - - need backup

19   documentation for invoices."  Id. at No. 37.

20       Once POST changed its billing requirements, the billings RTC submitted included

21   actual cost figures and back-up invoices.  Id. at Nos. 46, 52-53.  RTC maintains it never,

22   either expressly or impliedly, falsely represented anything in its VAWA invoices or made

23   any untrue statement or certification to get its invoices paid.  According to RTC, it did not

24   know that the federal VAWA grants, as well as the state VAWA subgrants to CEMA,

25   required either actual costs invoices or supporting documentation until after CEMA's

26   March 16-17, 2010, audit, and accordingly made no representations that it would comply

27

28       [5] The terms of CEMA's annul subgrants of VAWA funds to POST apparently did not contemplate either budget-based billing or any deferral on producing supporting documentation.  Id. at Nos. 42-43.

1    with those requirements prior to that time.  Id. at Nos. 49-50.  RTC also denies that

2    POST ever incorporated any federal or CEMA requirements into its annual contracts with

3    RTC.  Id. at No. 48.  Moreover, although POST's annual contracts with RTC did call for

4    actual-cost invoicing, because it had been instructed by POST since 1997 to instead use

5    a budget-based methodology, RTC alleges it had no reason to believe it should proceed

6    otherwise.

7         Relator's lawsuit, filed on March 19, 2015, after her employment with POST

8    ended, alleges that RTC "knowingly, falsely and fraudulently" misrepresented material

9    facts to POST through its invoices in order to unlawfully obtain funding from CEMA

10   and/or OVW.  Compl., ECF No. 1, ¶¶ 2-5.  Relator alleges that when the CEMA audit

11   was scheduled in February 2010, Michele Thompson refused to provide supporting

12   documents and during a subsequent meeting with Edmund Pecinovsky, was told that

13   RTC could recreate documents as necessary.  Relator claims she told Pecinovsky there

14   were "serious problems with RTC's management of the grant funded contracts" and that

15   "RTC had claimed reimbursement for expenses which could not be justified or proved."

16   Id. at ¶ 26.  During the March 16, 2010, CEMA audit itself, Relator claimed that RTC had

17   failed to produce necessary documentation for certain expenses and was told by the

18   auditors that this "would be reported as an adverse finding in their compliance audit."  Id.

19   at ¶ 28.  Realtor claims that after taking time off work to recuperate from surgery in June

20   2010, her responsibilities reviewing reimbursements of the spending of federal funds

21   relating to contracts with RTC were reassigned.  Id. at ¶ 35.  At some unspecified point

22   thereafter Relator was fired.  Pl.'s Memo, ECF No. 81, 2:9-11.

23        In now moving for summary judgment as to liability, Relator argues there is no

24   genuine issue of material fact that RTC submitted false invoices because its invoices

25   were "contrary to the requirements of its plain-language contracts with POST."  Pl.'s

26   Mem., ECF No 81, 3:18-19.  RTC followed up with its own motion for summary judgment

27   made on grounds that Relator has not demonstrated fraud on its part, and that Relator

28   cannot qualify as an "original source" for purposes of pursuing a viable FCA claim.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

1  not establish the absence or presence of a genuine dispute, or that an adverse party

2  cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

3  opposing party must demonstrate that the fact in contention is material, i.e., a fact that

4  might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

5  Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

6  Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also

7  demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

8  such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

9  477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

10  before the evidence is left to the jury of "not whether there is literally no evidence, but

11  whether there is any upon which a jury could properly proceed to find a verdict for the

12  party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

13  (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

14  As the Supreme Court explained, "[w]hen the moving party has carried its burden under

15  Rule [56(a)], its opponent must do more than simply show that there is some

16  metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,

17  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

18  non-moving party, there is no 'genuine issue for trial.'"  Id. at 587.

19      In resolving a summary judgment motion, the evidence of the opposing party is to

20  be believed, and all reasonable inferences that may be drawn from the facts placed

21  before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

22  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

23  obligation to produce a factual predicate from which the inference may be drawn.

24  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

25  810 F.2d 898 (9th Cir. 1987).

26  ///

27  ///

28  ///

1

**ANALYSIS**

2

3        **A.        Statutory Framework and Parameters of Liability**

4        The FCA imposes liability for the knowing submission of false claims seeking

5 receipt of federal funds on the grounds that such claims defraud the United States.

6 31 U.S.C. § 3729(a)(1) (A)-(B).  The essential elements of a claim under the FCA are

7 (1) a false claim or a "false statement or fraudulent course of conduct, (2) made with

8 scienter (knowledge of falsity), (3) that was material, causing (4) the government to pay

9 out money or forfeit moneys due."  United States ex rel. Hendow v. University of

10 Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006).

11        While these fundamental elements for maintaining an FCA claim have not

12 changed, amendments to § 3729 in 2009 have changed the scope of liability, and

13 because those changes affect Relator's claims against RTC here, they should be

14 outlined at the onset.  The differences between the pre-2009 version of the statute and

15 its currently operative terms are particularly important since the budget-based billings in

16 question, which continued until December 31, 2009, date from both before and after the

17 2009 changes.

18        In pertinent part, the 1986 version of § 3729(a) only makes it unlawful to present a

19 false claim for payment to the United States Government:

20                (a) **Liability for Certain Acts.**  ---Any person who—

21                        (1)  Knowingly presents or causes to be presented, to
                         an   officer   or   employee   of   the   United   States
22                        Government or a member of the Armed Forces of the
                         United States a false or fraudulent claim for payment
23                        or approval;

24                        (2)  Knowingly makes, uses, or causes to be made or
                         used, a false record or statement to get a false or
25                        fraudulent claim paid or approved by the Government;

26                        ……

27 ///

28 ///

1 | 2

> . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages. . .

3    31 U.S.C. § 3729(a)(1).

4    Consequently, to the extent the 1986 version of the statute applies, Relator's case

5    against RTC fails to qualify because it is undisputed that no claim was presented directly

6    to the United States government, as required by its terms.  Instead, as the foregoing

7    factual background section makes clear, the invoices at issue were presented only to

8    POST, a state (as opposed to federal agency) that disbursed funds for VAWA programs

9    furnished by the United States government.  Significantly, the Supreme Court, in <u>Allison</u>

10   <u>Engine Co., Inc. v. United States ex rel. Sanders</u>, 553 U.S. 662 (2008), declined to

11   revise or rewrite the operative 1986 language to apply to non-government parties using

12   federal funds, instead implicitly finding that it was Congress' duty to rewrite the statute to

13   establish liability in such circumstances if it saw fit to do so.  <u>Id.</u> at 668.

14   On May 20, 2009, in the wake of <u>Allison Engine</u>, Congress passed the 2009

15   Fraud and Recovery Act, Public Law 111-17 ("FERA"), amended subdivisions (a) and (b)

16   of the 1986 version of § 3729 in pertinent part as follows:

17   **(a)  Liability for Certain Acts.**

18   **(1)  In general**. --- . . . any person who---

19   (A)  Knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval;

20

21   (B)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

22

23   . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . , plus 3 times the amount of damages.

24

25   31 U.S.C. § 3729(1)(1).

26   In addition to omitting any requirement, as set forth in the 1986 version of the

27   statute, that any false claim or statement must be made to the United States

28   Government, the 2009 changes under FERA also include a new definitional

1    subdivision (b) which expands liability for such claims or statements beyond the

2    government alone:

3           (b)   **Definitions**.  --- For purposes of this section ---

4                           …..

5          (2)  the term "claim" ---

6            (A)  means any request or demand, whether under a

7    contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . .

8

9               (i)  is presented to an officer, employee, or agent of the United States; or

10               (ii)  is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government ---

11

12

13                     (I)    Provides or has provided any portion of the money or property requested or demanded; or

14

15

16                     (II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

17

18

19    31 U.S.C. § 3729(b) (2009).

20       Consequently, under the current 2009 version of the statute, a claim need not be

21    directly submitted to the government in order to trigger liability under the FCA, and can

22    include claims or statements made to any entity as long as that entity is paying claims on

23    the government's behalf using monies provided in whole or in part by the government.

24    Thus, the FERA amendments brought claims presented to a state agency like POST

25    under the potential purview of the FCA.

26       Section 4(f)(1) of the FERA also prescribed the effective dates of its changes to

27    the relevant statutes, including § 3729, stating that

28    ///

> The amendments made by this section. . . shall take effect on the date of enactment of this Act [May 20, 2009], and shall apply to conduct on or after the date of enactment [May 20, 2009], except that ---
>
> (1)  Subparagraph (b) of section (a)(1) [of § 3729] . . . shall take effect as if enacted on Jun 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date;

Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (May 20, 2009).

While these terms on their face would appear to indicate that Congress intended only claims for payment submitted after May 20, 2009, or false statements made with respect to a false claim already made after June 7, 2008, to be subject to FERA's new provisions, applicable case law has also made this clear.  First, given the well-settled general presumption against retroactive legislation, and the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place, the Supreme Court has already found that amendments to the FCA do not apply to any alleged misconduct occurring before an amendment's date of enactment.  Hughes Aircraft  Co. v. United States ex rel. Schumer, 520 U.S. 939, 946 (1997).

Additionally, the Ninth Circuit, in Cafasso, United States ex rel. v. General Dynamics C4 Systems, Inc., 637 F.3d 1047 (9th Cir. 2011), has recognized that FERA's 2009 amendments to the FCA statutes do not apply retroactively.  Id. at 1051 n.1.   In so doing, Cafasso, a decision in which this Court participated by designation, cited to the Eleventh Circuit's opinion in Hopper v. Solvay Pharms., Inc., 588 F.3d 1318 (11th Circuit 2009).  There, the court reasoned that to the extent § 3729(a) referred to a "claim," the claim had to be pending prior to the dates specified in FERA, which was either June 7, 2008, for existing claims for which material false statements were made, or May 20, 2009, for new claims for payment deemed false or fraudulent.  See id. at 1327, n.3.

Relator nonetheless argues that the 2009 amendments should be given retroactive effect, which would potentially allow her to reach any purportedly false claim made by RTC to POST extending back to March 19, 2005, which would correspond to

///

13

1   the statutory limitations period for bringing a FCA claim.[6]  In so doing, she urges the

2   Court to reconsider Cafasso.  This Court cannot do so.  Therefore, the only RTC claims

3   for payment germane to the Court's decision are those pending as of June 7, 2008, as to

4   which a material false statement was made by RTC thereafter, or those presented after

5   the May 20, 2009, enactment date of the FERA amendments.  With those parameters in

6   mind, we now turn to whether Relator can establish that claims or statements made

7   during that period were false or fraudulent so as to come within the purview of the FCA.

8   **B.      Falsity of Claims**

9          The thrust of Relator's argument as to falsity is that because RTC submitted

10   budget-based billings in the face of written annual contract terms with POST that

11   required that actual expenditures be submitted, Relator's invoices were by definition

12   false and/or fraudulent.  Relator has not taken issue with RTC's statement of undisputed

13   facts in support of its motion upon which the background section of this Memorandum

14   and Order largely relies.[7]  Instead, according to Relator, even under RTC's own

15   recitation of pertinent events it still submitted false invoices actionable under the FCA,

16   and Relator's own motion is based upon that characterization.  Indeed, Relator's

17   argument is that because RTC "received federal VAWA funds contrary to the

18   requirements of its plain-language contracts with POST . . . those invoices are the

19   definition of affirmative false claims under [both subdivisions of Section 3729(a)(1)], the

20   central pillars of the False Claims Act."  Relator's Mot., ECF No. 81: 3: 17-23.

21          As previously set forth, the Court is limited to examining statements made with

22   respect to invoices pending after June 7, 2008, and invoices submitted after May 20,

23

24          [6] Relator does not take issue with Defendant's assertion that the statutory limitations period
     applicable here is ten years.  See Def.'s Mem., ECF No. 85-1, 10:26-28 (citing Cochise Consultancy,

25   Inc. v. United States ex rel. Hunt, 139 S.Ct. 1507 (2019).

26          [7] Relator failed to file any statement in response to RTC's Statement of Undisputed Facts in
     Support of Motion for Summary Judgment (ECF No. 85-2) in violation of E.D. Local Rule 260(b).  In
     addition to that failure, Plaintiff also failed to offer any response to RTC's largely identical Statement (ECF

27   No. 89-2) in support of its opposition to Relator's Motion.  When taken together and particularly given the
     gravamen of Relator's argument that the pertinent facts here are essentially undisputed, the Court

28   concludes those failures were not due to any inadvertent oversight.

2009.  Additionally, it is undisputed that once POST requested that RTC submit actual

expenses, as opposed to budget-based invoices, beginning on January 1, 2010, RTC

complied with that request.[8]  No evidence has been submitted that RTC made any false

or fraudulent claims for payment after that time.  Accordingly, the Court will focus on a

narrow window here of between June 7, 2008 and December 31, 2009, for existing

claims, and between May 20, 2009 and December 31, 2009, for the submission of new

claims.

Putting this into the proper temporal perspective, the evidence before the Court is

that POST indicated at the outset of its contracting with RCT for VAWA classes in 1997

that it would accept budget-based invoices based on several certain unavoidable cost

variables in an arrangement that had apparently been approved by its counsel.  UMF

Nos. 11-12, 51.  POST continued to pay VAWA's invoices for the next 12 years based

on that arrangement even though it was aware that the written terms of its annual

contract with RTC provided for actual cost invoicing.  Although RTC also knew that

POST's practice in that regard diverged from its written contract, the Court concludes

that this long course of conduct made it fully reasonable for RTC to believe that POST

preferred that invoices be submitted in a budgeted format.[9]

Tellingly, even Relator concedes that POST was fully aware of the above billing

arrangements it had with RTC.  See Def.'s Opp., ECF No. 89, 11: 20-25.  Given that

admission, Relator resorts to an argument that POST was "equally complicit" with RTC

in allegedly defrauding the federal government.  Id.  At the end of the day, however, it is

clear that there is no misrepresentation or concealment on RTC's part giving rise to

fraud.  RTC was simply presenting its billings in a format that POST had approved and

---

[8] Between January 1, 2010, and June 30, 2010 (the end of fiscal year 2009-2010), RTC submitted its billings to POST using both the budgeted amounts from its 2009-10 annual contract with POST and its actual costs.  Thereafter, starting with the onset of the new 2010-11 fiscal year on July 1, 2010, RTC used actual costs, only.  See UMF No. 32.

[9] It is undisputed that the terms of RTC's annual subgrants did not reference any requirements with which POST had to comply with as a precondition to receiving the VAWA grants from the federal government and disbursing those funds by way of subgrant to contractors like RTC.  See UMF No. 42.

1   paid for many years, and despite the language in the POST annual contracts with RTC,

2   POST believed that it was authorized by its own internal regulations to accept budget-

3   based billings.  There is no evidence whatsoever that RTC tried to in any way conceal

4   the fact that it was submitting budget-based billings; that fact was well-known to both

5   RTC and POST.  And, as to RTC, there is no evidence that it knew that the terms of the

6   federal VAWA grant made first to CEMA, and then assigned to POST for entering into

7   subcontracts with vendors like RTC, had any requirement that actual costs be used;

8   indeed, Michelle Thompson states she had no such knowledge prior to the time of the

9   CEMA audit in March of 2010 and therefore made no representations that she could or

10  would comply with the terms of the federal VAWA grant.  UMF Nos. 49-50.  Even if

11  POST arguably knew that it should have required actual billings and that its own internal

12  regulations did not apply,[10] any such knowledge cannot be imputed to RTC under the

13  circumstances.  Even if POST did not comply with the terms and conditions of the VAWA

14  federal grants and CEMA's state subgrant, any such failure in that regard does not

15  implicate RTC or render false RTC's VAWA invoices for the amounts budgeted.  Def's

16  Reply, ECF No. 95, p. 3.  POST is not named as a defendant in Relator's lawsuit, and

17  since both RTC and POST knew and agreed prior to January 1, 2010, that VAWA

18  course invoices could be formulated by budget and not through the submission of actual

19  costs, there is no fraud or falsity on RTC's part in submitting those invoices to POST for

20  payment.

21       In short, no evidence has been submitted that RTC knowingly presented false

22  invoices given these circumstances, and there is also no evidence that RTC ever made

23  any untrue statement or certification to get its invoices paid.  UMF No. 55.  Significantly,

24  too, to the extent that the terms of the VAWA grants to CEMA itself required either actual

25  cost invoices or supporting documentation with respect to CEMA's disbursement of

26  those federal funds, there is no evidence that RTC knew about those terms prior to the

27       [10] As previously indicated, POST did not know that it could not use its own internal regulations for payment of federal funds until the CEMA audit.  See Pecinovsky Dep., 84:3-13.

28

1  March 2010 audit, and after that audit it complied with POST's requests accordingly.[11]

2  None of this suggests falsity.  Consequently, the Court concludes that this fundamental

3  prerequisite for FCA liability is lacking, and Defendant is entitled to summary judgment

4  on that basis alone.

5      **C.      Scienter**

6      In addition to showing a course of false or fraudulent conduct, which the Court

7  concludes has not been shown here, Relator must also demonstrate scienter on RTC's

8  part in order to maintain a viable FCA claim against it.  Hendow,, 461 F.3d at 1174.  The

9  FCA imposes civil liability on "any person who … knowingly presents, or causes to be

10 presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a).  In

11 order to "knowingly" present a false claim under the FCA and thereby demonstrate

12 scienter, however, "no proof of specific intent to defraud" is required.  Id. at

13 § 3729(b)(1)(B).  Presenting a knowingly false claim, however, does require "a palpably

14 false statement, known to be a lite when it is made."  Hendow, 461 F.3d at 1172.  In

15 addition, the FCA broadly defines the term "knowing" to include "deliberate ignorance" or

16 "reckless disregard."  31 U.S.C. § 3729(b)(1)(A)(ii)-(iii).

17     Relator's claims against RTC here also fail on scienter grounds.  As detailed

18 above, there is no evidence that RTC submitted budget-based VAWA invoices to POST

19 knowing or recklessly believing that POST believed they were for actual expenditures.

20 Instead, the evidence shows that POST knew the invoices were budget-based and that it

21 had paid them on that basis for many years after initially establishing budgeting

22 parameters based on actual costs RTC had incurred for putting on the pertinent VAWA

23 courses.

24 ///

25 ///

26

27     [11] While Relator cites various portions of the deposition of Michelle Thompson to support its argument that falsity and/or fraud were in fact present, Defendant properly rebutted those citations as being either incorrect or taken out of context, and Relator offered no response.  See Def.'s Statement of

28 Material Facts in Opposition, ECF No. 89-2, Nos. 33-40.

1

### D.    Materiality

2   Even assuming that there was a misrepresentation made by RTC to POST and

3   that misrepresentation was made "knowingly" by POST, both of which the Court

4   concludes have not been established for purposes of attaching liability to RTC, Relator

5   must also show that RTC's knowing misrepresentations were "material" to POST's

6   decision to pay its VAWA invoices.  Relator is no more successful in showing that third

7   prerequisite.

8   The term "material," for purposes of FCA liability, means "having a natural

9   tendency to influence, or be capable of influencing, the payment or receipt of money or

10  property."  31 U.S.C. § 3729 (a)(4), see also Universal Health Services, Inc. v. United

11  States ex rel. Escobar, 579 U.S. 176, 192-93 (2016); citing Neder v. United States,

12  527 U.S. 1, 16 (1999).[12]  The materiality standard is "demanding," and cannot be found

13  where the alleged noncompliance is "minor or insubstantial."  Escobar, 479 U.S. at 194.

14  As the Supreme Court notes, if a particular claim is paid in full, or if particular kinds of

15  claims are regularly paid in full despite "actual knowledge that certain requirements were

16  violated, that is very strong evidence that those requirements were not material."  Id.

17  at 195.

18  Here, the alleged noncompliance is rooted in the fact that RTC's annual contracts

19  require actual cost billing despite the fact that POST's course of practice over many

20  years had been to pay RTC's invoices based on budgeted amounts.  The undisputed

21  evidence shows that POST was aware of the terms contained in the written contract but

22  modified that requirement by accepting budget-billing and paying RTC's invoices

23  ///

24  ///

25

26  [12] While Relator argues that the materiality requirements of § 3729(a)(4) should be limited to claims submitted to the United States government directly, the language of the statute is not so limited. Indeed, subsection (b)(2)(A)(ii) contemplates that an entity other than the government (like POST herein) may in fact be paying the claim, albeit using federal funds or being entitled to reimbursement from such funds. 31 U.S.C. § 3729(a)(4) (2009).  Nor does the decision in Escobar support Relator's argument in that regard, because there the false claims in question were submitted to the Massachusetts Medicaid program for reimbursement, not to the United States.  579 U.S. at 184-85.

27

28

18

accordingly.[13]  Given that longstanding practice, any requirement in the written contract for actual cost billing was not material given the logic of Escobar as enumerated above. Consequently, Relator's claims fail on materiality grounds as well.[14]

**CONCLUSION**

For all the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 85) is GRANTED and Relator's Motion (ECF No. 81) is DENIED.  The Clerk of Court is directed to enter judgment in favor of Defendant Southern California Intergovernmental Training and Development Center accordingly and to close this case.

IT IS SO ORDERED.

DATED:  March 25, 2022

_____
MORRISON C. ENGLAND, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[13] Moreover, as indicated above, there is no evidence that RTC even knew that the terms of the federal VAWA grants required actual cost invoicing until after the February 2010 CEMA audit. Additionally, there is also no evidence that POST solicited, enlisted, or conspired with RTC to violate the terms and conditions of the federal VAWA grants or state sub-grants, since RTC did not even know about those terms and conditions until 2010.

[14] The Court recognizes that the parties, along with briefing whether false representations giving rise to FCA liability were in fact made, also address the question of whether Relator qualifies as an "original source" in disclosing any such representations, or whether a prior "public disclosure" precluded her from so qualifying and thereby being entitled to bring an FCA action.  Because the Court finds that no false claims are present in the first instance, it need not address the additional question of whether Relator qualified as an original source, or whether a prior public disclosure occurred, and declines to do so.